SUMMONS - CIRCUIT COURT                                                3101-1 (Rev. 03/2011)

| STATE OF ILLINOIS | UNITED STATES OF AMERICA<br>IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT | COUNTY OF DU PAGE |

**JOINT COMMISSION
RESOURCES, INC.,**
_____
PLAINTIFF

vs

**SISKIN TECHNOLOGIES, INC.**
_____
DEFENDANT

**2014CH000317**
_____

**CASE NUMBER**

File Stamp Here

**SUMMONS**
**CIRCUIT COURT**

☒ ORIGINAL  ☐ ALIAS

To each Defendant: **SISKIN TECHNOLOGIES, INC.** _____

You are Summoned and Required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance in the office of the Clerk of the Circuit Court, 505 N. County Farm Road, Wheaton, Illinois, within 30 days after service of this summons not counting the day of service.

If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

To the Officer

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service and not less than three (3) days before the date of appearance. If service cannot be made, this summons shall be returned so endorsed.

This summons may not be served later than thirty (30) days after its date.

| **DATE OF SERVICE** |
| TO BE INSERTED BY OFFICER ON COPY LEFT WITH DEFENDANT<br>OR OTHER PERSON |

**WITNESS:** FEB 18 2014

Name: Linda K. Stevens _____ ☐ PRO SE

DuPage Attorney Number: 76000

Attorney for: Plaintiff Joint Commission Resources

Address: 233 S. Wacker Dr., Suite 6600

City/State/Zip: Chicago, Illinois 60606

Telephone Number: 312-258-5667

**CHRIS KACHIROUBAS,** Clerk of the Eighteenth Judicial Circuit Court, and the seal thereof, Wheaton, Illinois

493

BY _____
DEPUTY CLERK

**NOTE:**

The filing of an appearance or answer with the Circuit Court Clerk requires a statutory filing fee, payable at the time of filing.

If you need legal advice concerning your legal responsibility as a result of this summons being serviced upon you and you don't have a lawyer, you can call the DuPage Bar Association, Lawyer Referral Service at 630-653-9109.

**CHRIS KACHIROUBAS, CLERK OF THE 18th JUDICIAL CIRCUIT COURT ©**
**WHEATON, ILLINOIS 60187-0707**

SUMMONS - CIRCUIT COURT                                                    3101-2 (Rev. 03/2011)

## SHERIFF'S FEES

Service and return ........................................................... $ _____

Miles _____ ........................................................ $ _____

**Total** ................................................................................ $ _____

Sheriff of _____ County

## SHERIFF'S RETURN

I certify that I served this summons on defendant as follows:

☐    (a)    (Individual - **personal**):
By leaving a copy and a copy of the complaint with each individual as follows:

☐    (b)    (Individual - **abode**):
By leaving a copy and a copy of the complaint at the usual place of abode of each individual with a person of his family, of the age of 13 years or upwards, informing that person of the contents of the summons, and also by sending a copy of the summons and the complaint in a sealed envelope with postage fully prepaid, addressed to each individual at the usual place of abode, as follows:

☐    (c)    (Corporation):
By leaving a copy and a copy of the complaint with the registered agent, officer, or agent of each corporation as follows:

☐    (d)    (Other service):

☐    (e)    (Unable to Serve):
By _____ ,    Deputy Badge Number: _____

---

Name of Defendant _____

Name of Person
summons given to   _____

Sex _____ Race _____ Approx. age _____

Place of service _____

City , State   _____

Date of service _____ Time _____

Date of Mailing _____

Special Process Server of _____

Name of Defendant _____

Name of Person
summons given to   _____

Sex _____ Race _____ Approx. age _____

Place of service _____

City , State   _____

Date of service _____ Time _____

Date of Mailing _____

Sheriff of _____ County

County Illinois License # _____

By _____

IN THE CIRCUIT COURT FOR THE EIGHTEENTH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS
CHANCERY DIVISION

2014CH000317

JOINT COMMISSION RESOURCES, INC.,    Status Date: 06/17/14

        Assigned To: 2005

        **Plaintiff,**

**v.**

**SISKIN TECHNOLOGIES, INC.,**

        **Defendant.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

Feb 18 2014 – 11:21 AM

No. *Chris Kachiroubas*

CLERK OF THE
18TH JUDICIAL CIRCUIT
DU PAGE COUNTY ILLINOIS

## VERIFIED COMPLAINT
## FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Joint Commission Resources, Inc. ("JCR" or "Plaintiff") states as follows for its

complaint against Siskin Technologies, Inc. ("Siskin" or "Defendant"):

## INTRODUCTION

1.      This action is brought by plaintiff JCR against Siskin, a consulting firm formerly

engaged by JCR to provide computer and information technology-related services to JCR, to

remedy Siskin's failure to return JCR property at the end of its engagement. The relationship

having soured, Siskin informed JCR that it would perform no further services and that it would

not return to JCR any of its property, including highly confidential hospital accreditation data as

well as software source code needed to operate several of JCR's crucial business systems. Siskin's

unlawful retention of JCR's property is resulting in substantial and irreparable harm to JCR and to

the public, including JCR's inability to perform a number of business functions in connection

with its hospital accreditation services and to assist its clients in making needed improvements in

the quality and safety of patient care. In addition to monetary damages, JCR therefore seeks equitable remedies, including preliminary and post-trial injunctive relief.

**FACTS**

**The Parties and Jurisdiction**

2.      JCR is an Illinois not-for-profit corporation formed under the laws of Illinois with its principal place of business in Oak Brook, Illinois. As described in more detail below, JCR provides services and resources to healthcare organizations to help them improve the quality of care and patient safety, and is the premier international organization engaged in the certification and accreditation of hospitals and other healthcare organizations.

3.      Defendant Siskin is an Illinois corporation with its principal place of business at 3296 Oak Knoll Road, Carpentersville, Illinois. Siskin is engaged in the business of providing consulting and information technology ('IT') services to companies located in Chicago and the surrounding area.

**The Important Mission of The Joint Commission and JCR**

4.      The business activity relevant in this case is the accreditation and certification of healthcare organizations—a designation that the organization meets a particular set of standards. The most respected and important accrediting body in the United States is plaintiff JCR's parent, The Joint Commission, an independent, not-for-profit organization that accredits and certifies more than 20,000 healthcare organizations and programs across the country. The Joint Commission created JCR in order to help fulfill its mission of improving safety and the quality of patient care.

5.      JCR engages in two primary categories of activities: (a) both domestically and abroad, JCR provides technical consultation services, educational programs, and other

2

informational resources to healthcare organizations for the purpose of improving safety and the quality of patient care, including publications, web-based applications, educational conferences, webinars, and technical consultative services; and (b) outside the United States, JCR acts as the international counterpart to The Joint Commission, providing accreditation and certification (similar to the accreditation provided by the Joint Commission in the U.S.) to healthcare organizations in foreign countries, through its Joint Commission International division ("JCI"). JCR's JCI division is the leading international accrediting body, issuing international accreditation standards (the "Accreditation Standards") and accrediting or certifying more than 650 healthcare organizations in 57 countries.

6.      An organization's qualification for accreditation or certification is determined by use and reference to a set of proprietary standards – Joint Commission creates and issues standards for accreditation in the United States, and JCR's JCI Division creates and issues the Accreditation Standards for accreditation abroad.  Application of these standards improves safety and patent care, and accreditation by the Joint Commission and JCR has become the gold standard in the healthcare industry world-wide.

7.      The process by which JCR evaluates an organization's qualification for accreditation is called a "survey," whereby a team of JCR experts (called surveyors) travel to a healthcare organization to view and evaluate first-hand the extent to which that organization follows the Accreditation Standards.  JCR conducts hundreds of these surveys – in countries all over the world – every year.

**JCR's Confidential Data**

8.      In the performance of these services for its clients, JCR generates and processes a large amount of highly sensitive and confidential data, including the information gathered by

3

JCR's cadre of surveyors in the course of performing (and as a result of) their hospital accreditation surveys, the findings and results of those surveys which describe the facility's performance and its need for service and safety improvement, as well as the detailed improvement plans derived from analysis of the survey results. JCR also creates and maintains internal JCR performance evaluations of its surveyors (all of this information and data is hereinafter referred to as the "Confidential Data").

9.    The Confidential Data is extremely sensitive and confidential for two primary reasons. First, the confidentiality of this information is critical to JCR's operations. JCR is not the only entity that offers to provide consulting services and counseling with regard to standards accreditation. Rather, there are competitors for that business who would gain an advantage, and reap a substantial windfall, if they were to obtain the Confidential Data. For example, such competitors could copy the approach and operation of JCR's systems, or learn ways to improve their own systems, or determine how to better compete with the JCR services that depend on those systems. Similarly, JCR considers (and maintains) the performance evaluations of its surveyors as confidential as well, both to protect those surveyors from being recruited by others and also to maintain the privacy and confidentiality of the individuals to whom those records pertain. The confidentiality concerns of others also drives the second primary reason that the Confidential Data must be protected – the confidentiality needs and concerns of JCR's healthcare provider clients. The information developed by JCR during the survey and consulting process regarding hospitals' and clinics' operations and patient care is considered by those facilities and JCR to be highly confidential, and they allow JCR to generate and maintain this information only under the strictest confidentiality. This confidentiality allows the healthcare facilities to engage in the evaluation and analysis that is so important to prepare for accreditation. Thus,

4

unauthorized disclosure or use of the Confidential Data would be devastating to JCR's business in several respects—it would strike a competitive blow to JCR, undercut the confidence placed in JCR by its clients and irreparably damage its relationships with those clients, and undermine the entire accreditation process in which JCR helps its clients to participate.

10.      Thus, it is difficult to overstate the value of JCR's Confidential Data, the importance and depth of the trust that JCR's clients repose in it to develop and safeguard the data, and the crucial need to keep this data confidential.  This data, and JCR's ability to engender and maintain the confidence of the clients who entrust it to JCR's care, are the lifeblood of the company.

**JCR's Crucial Systems and Tools**

11.      JCR's business—performing surveys across the globe, collecting and analyzing the data and interpreting the results from those surveys, generating meaningful strategic approaches for improvement of each healthcare organization's deficiencies, communicating with JCR's vast network of surveyors and clients, and managing a large universe of confidential data—requires the use of automated systems and tools in order to operate effectively and efficiently.  Those systems and tools include the following:

A.      <u>International Database for Accreditation (IDBA)</u>.  The IDBA is used to collect, record, manage, and analyze the data generated by JCR's surveyor teams.  This system is populated with the Accreditation Standards, a long list of metrics and other indicia of compliance with the Accreditation Standards, and fields for the surveyors to fill-out describing compliance with each item.  After the data is input by the surveyors, analyses can be performed on the data, and reports can be generated, to describe the extent to which a client is (or is not) in compliance. The IDBA then generates a detailed list of findings regarding the standards and measurable

elements within the standards with which the client was not compliant and that require improvement. Clients are given limited system entry credentials so that they can access the reports generated by JCR regarding their particular survey. The IDBA has been used by JCR for many years, and is the central database and tool that enables JCR to perform its accreditation services.

      B.    <u>Strategic Improvement Plan (SIP) Tool</u>. The SIP is a feature of the IDBA database that JCR recently added to the IDBA in order to allow the performance of an additional function. The SIP tool operates in conjunction with the IDBA, and uses the data contained within the IDBA. Specifically, the SIP feature of the IDBA uses the data within the IDBA generated and input by the surveyors regarding their observations about the degree to which a healthcare organization does, or does not, meet the Accreditation Standards. After the surveyors' observations are put into the IDBA, and after the IDBA has helped to identify steps for improvement, this tool allows clients to participate in the formulation of a 'Strategic Improvement Plan'–a list of action items customized to their particular organization regarding how they intend to address the specific findings resulting from the survey data.

      C.    <u>Accreditation Engagement System.</u> This is a calendaring system, which allows JCR to schedule, and keep track of, its survey engagements. This system is Lotus Notes®-based, but it has been customized for JCR's particular usage and to operate in connection with its other systems.

      D.    <u>Expense Reporting System.</u> In order to collect, process, and manage all of the information regarding the expenses incurred by the cadre of JCR surveyors and technical consultants who travel the globe on its behalf, JCR uses another Lotus Notes-based system that has been customized to JCR's needs and creates individualized expense forms for each

surveyor/consultant to use. The system generates templates for each user that are automatically populated with a list of, and information regarding, that user's particular survey/consultancy engagements. The users then complete the forms for submission to, and processing by, JCR. This expense reporting system is integrated into and works in conjunction with JCR's other systems, including its engagements scheduling system.

E.    International Scheduling Information System (ISIS) interface to Lotus Notes. JCR is planning to adopt and use a "next generation" scheduling system, to replace the Accreditation Engagement System described above. That new system cannot not be adopted and used, however, without the development of an "interface" between the new scheduling program and JCR's other existing systems. Consequently, the ISIS interface has been developed to provide communication and interconnectivity between the new scheduling system and JCR's other, existing systems. This interface was not available off-the-shelf, but rather had to be specially created as an addition to JCR's systems and to function with, and act as a connection between, those systems.

F.    Other Report and Template-Generating Applications. JCR has further automated its operations through the use of other applications that generate reports and templates for the communication of data and information, both internally and between JCR and its clients.
These systems and tools are hereinafter referred to as JCR's "Systems and Tools." As is evident from the description above, JCR's access to and use of these Systems and Tools is crucial to its ability to function and to provide the services and information needed by its healthcare clients for them to deliver safe and effective patient care.

## Siskin's Work on the Systems and Tools

12. Like many businesses, JCR has hired outside IT consulting firms to perform various services in connection with its computer equipment and Systems and Tools. For approximately 10 years, JCR has engaged and utilized Siskin as an independent contractor to provide various services in connection with certain JCR Systems and Tools, including making updates and improvements, adding features or functions, helping to maintain them, and providing other technical support.

13. The terms on which JCR and Siskin agreed – and confirmed and established over more than a ten-year course of dealing – for the engagement include the following:

- Siskin would provide help with the operation and maintenance of certain JCR software programs as an independent contractor to JCR;

- JCR would pay Siskin by the hour (the hourly rate most recently paid by JCR was $90/hour);

- Siskin would provide JCR on a weekly basis with (i) a status reports detailing the work that it had provided in the prior week, and (ii) an invoice for that work;

- That work included the updating of certain of JCR's Systems, and the development of certain functions or features to be added to, and used in conjunction with, JCR's systems;

- That any code (including applications, tools, scripts, agents and automated templates) developed by Siskin for use in conjunction with JCR's Systems and Tools would belong to JCR; and

- Siskin would keep confidential all JCR confidential information and data to which it received access for the purpose of performing its engagement.

14. At this time, JCR is attempting to locate a written contract, executed by both Parties, reflecting their agreement. It has located various contact forms that were sent at various points during the relationship and purport to cover various periods of time, at least one of which was signed by Siskin although not by JCR (the "Contract Forms"), but it has not been able to determine which of those Contract Forms (if any) was executed by both JCR and Siskin. A copy

8

of the Contract Form sent by Siskin to JCR—and most recently signed by Siskin on February 25, 2013—is attached hereto as Exhibit A.

15.     Noticeably absent from Exhibit A is any assertion by Siskin that it would own— and/or have the right to deprive JCR of—whatever pieces of code Siskin might develop for use in conjunction with JCR's existing systems.  Indeed, Siskin never asserted any rights in such code during the Parties more than 10-year relationship and course of dealing.  None of the Contract Forms sent by Siskin asserts ownership of whatever work product Siskin might create for JCR.  Those forms were silent on that issue—they stake no claim, and assert no right, to any work product and give no hint of any kind that JCR might lack the ability to continue to use whatever systems and tools Siskin might improve or otherwise work on.  And at no time during the relationship did Siskin suggest—in any way—that this might be the case.  Indeed, the first time that Siskin ever suggested its current position—that it has the right to deprive JCR of access to the pieces of software code developed by Siskin during its engagement—was in the last few weeks, after the relationship between the parties had soured.

16.     The nature of the work performed by Siskin and of the code it created for JCR— specifically customized for JCR and for use within and/or in conjunction with JCR's existing systems—makes clear the parties' intent and expectation that JCR would hold the rights to that code.  More specifically, the following work done by Siskin pursuant to the Parties' contract is relevant to this matter:

A.     <u>International Database for Accreditation (IDBA)</u>.  The services that Siskin was asked to perform for JCR include certain maintenance on the IDBA and updating the IDBA to reflect and use the most recent generation of the Accreditation Standards.  Siskin did not develop or create the IDBA.  Rather, the IDBA had been created and used at JCR—as a customized

program specifically for JCR's operations–for a number of years *before* Siskin ever was involved

with the IDBA or was asked to perform any services with regard to the IDBA. Whatever code

Siskin updated or inserted into the IDBA was updated or inserted for the specific purpose of

updating or modifying the IDBA, e.g., to reflect and incorporate the new Fifth Edition of the

Accreditation Standards. The Fifth Edition of the Accreditation Standards is the result of three

years' of work by JCR to analyze where and what improvements might be made to patient care

and safety, and to formulate changes in the Accreditation Standards geared toward effecting

those improvements. JCR developed the new Fifth Edition Accreditation Standards, but asked

Siskin to write the pieces of software code necessary to update JCR's existing IDBA system

necessary to reflect–and apply–the new Fifth Edition standards. The software code created by

Siskin therefore is not a stand-alone product, has no utility by itself, and would have no use to

others. Rather, it is specific to JCR, its IDBA system, and its Accreditation Standards; and it was

created to be integrated within JCR's existing IDBA system, for the purpose of becoming part of

that system, for JCR's exclusive and continuing benefit and use.

B. <u>Strategic Improvement Plan (SIP) Tool</u>. Another task that Siskin was asked to

perform for JCR was to add on to the IDBA a feature that would process data already residing

within the IDBA (the survey results) to generate a list of steps for improvement. The SIP

generation tool was built onto the IDBA, for use in connection with the IDBA, in order to

process IDBA data. It does not operate without being applied to the data within the IDBA. It is

just one feature of the IDBA, and it has no function or purpose–and does not operate–divorced

from the IDBA.

C. <u>Code for Use with JCR's Accreditation Engagement System</u>. This is a Lotus

Notes-based system that JCR purchased off the shelf. Siskin did not create it. Among other

services provided by Siskin, it created a number of tools and "scripts" (code) for the day-to-day operation and support of this system. The code developed by Siskin for use with system therefore is not a stand-alone product, has no utility by itself, and would have no use to others. Rather, it is specific to–and was intended to and does function in conjunction with–JCR's other systems and its hospital accreditation activities.

D.      Code for Use with JCR's Expense Reporting System.   Siskin did not create JCR's expense reporting system. Rather, that system is a Lotus Notes-based system that has been customized for JCR's use, and Siskin's services to JCR included certain maintenance of that system, and the development and operation of a particular feature of the system that creates the surveyor-specific populated templates described above. The code for this feature is not a stand-alone product, has no utility by itself, and would have no use to others. Rather, it is specific to–and was intended to and does function in conjunction with–JCR's other systems and its hospital accreditation activities.

E.      International Scheduling Information System (ISIS) interface to Lotus Notes. Siskin did not develop or perform any work on JCR's new ISIS scheduling system. Siskin did, however, develop the communication "interface" to allow JCR's new ISIS scheduling system to communicate with its old scheduling system and with the other JCR Systems and Tools. That interface is not a stand-alone product, has no utility by itself, and would have no use to others. Rather, it is specific to–and was intended to and does function in conjunction with–JCR's other systems and its hospital accreditation activities.

F.      Code for the Posting of JCR's New Standards in the IDBA. JCR needs to make its Accreditation Standards available to its surveyors.  One of the ways it does this is through posting the standards in its IDBA database, which allows those with access criteria (such as

11

surveyors) to view the standards. The newest edition of the Accreditation Standards (the Fifth Edition) becomes effective on April 1, 2014. Siskin wrote the "Extraction Code" necessary to upload the Fifth Edition Accreditation Standards to the IDBA database. That extraction code is not a stand-alone product, has no utility by itself, and would have no use to others. Rather, it is specific to−and was intended to and does function in conjunction with−JCR's IDBA system, its Accreditation Standards, and its hospital accreditation activities.

       G.    <u>Other Report and Template-Generating Applications.</u>  During its more than ten-year history with JCR, Siskin developed a number of other report and template-generating tools. JCR is still in the midst of determining which of those other applications has been rendered inoperable or otherwise unavailable to JCR and therefore are relevant to this action.

       17.    JCR did not hire Siskin to create, and none of this work resulted in the creation of, a stand-alone software program or website that would have any function or utility divorced from JCR's systems. Rather, Siskin was hired to provide, and did provide, certain IT-related services to JCR, including help in maintaining and operating JCR's systems, and the drafting of small pieces or portions of code to be used in conjunction with (and in the case of Siskin's work on the newest version of the IDBA system, to be incorporated within) JCR's existing systems. Those pieces of code were developed specifically for JCR, and would be of no use to others.

       18.    Siskin performed this work, and was paid for it. All amounts due to Siskin have been paid by JCR, and Siskin has been paid in full. The amounts paid to Siskin for its services totals more than $1.2 million.

**The End of the Parties' Relationship and**
**<u>Siskin's Unlawful Retention of Information and Code</u>**

       19.    For most of their relationship, interactions between JCR and Siskin were cooperative and cordial, but in January of 2014, the relationship soured. Specifically, JCR's

12

Chief Information Officer recently initiated an effort to collect and review JCR's contracts with its IT vendors. He found that no current written contract could be located for Siskin. (The form contract attached hereto as Exhibit A had been executed by Siskin and sent to JCR for signature in February of last year, but was not signed by JCR.) JCR informed Siskin that it would not engage Siskin to perform any further series without a current, written contract in place, and it asked Siskin to sign its standard form agreement. Siskin refused, stating that it preferred to use its own form. JCR attempted to reach a compromise by marking-up Siskin's form, but Siskin rejected that overture as well. The tone and tenor of these discussions caused JCR to decide to wind down Siskin's engagement, and it began to talk to Siskin about the services necessary to transition out of the relationship. Siskin reacted by announcing, through its President Vera Dattulo on February 6, 2014, that it would perform no further work for JCR, and that it would not be returning any of the JCR property in its possession, apparently believing that this stance would force JCR to continue Siskin's engagement.

20.    When Siskin informed JCR that Siskin would stop performing services for JCR, Siskin was in the midst of working on and/or performing support functions for–and possessed certain JCR property in connection with–certain JCR Systems and Tools, including several having critical importance to impending launches of new initiatives at JCR.

a.    Confidential Data:  Siskin possesses and has failed and refused to return highly confidential data contained in the IDBA database, including survey findings and results and other sensitive information regarding JCR's hospital accreditation activities.

b.    Updated Version IDBA Source Code:  At the time that Siskin informed JCR that it would no longer perform work for JCR, it had been working on, and possessed, the updated and modified version of JCR's IDBA system, which was being updated in order to reflect JCR's new Fifth Edition standards in time for the April 1, 2014 launch of those new standards.

13

c. <u>Current Version IDBA Source Code:</u> In connection with its assignment to create code for the purpose of updating and modifying JCR's IDBA database (to contain and reflect JCR's new Fifth Edition Accreditation Standards) Siskin was provided with the source code for the *existing version* of the IDBA. At the end of the parties' relationship, Siskin has refused to return, not only the updated and modified version of the IDBA database, but the source code for the *existing version* of the IDBA as well.

d. <u>SIP Code and Agents:</u> Siskin also possess and has failed and refused to provide to JCR the source code for JCR's new Strategic Improvement Plan (SIP) tool, which JCR engaged Siskin to build on top of, and function in connection with, its IDBA system.

e. <u>Code Relating to JCR's Accreditation Engagement System and the Surveyor Expense Reporting Systems:</u> Siskin possesses and has failed and refused to provide to JCR various scripts, tools, agents and automated templates developed for the purposes of operating and supporting, and needed to operate and support, JCR's Accreditation Engagement System and the Surveyor Expense Reporting, systems.

f. <u>ISIS Interface:</u> Siskin possess and has failed and refused to provide to JCR the source code for the interface needed to allow JCR's new International Scheduling Information System (ISIS) to operate in connection with, and to communicate with, JCR's other systems.

g. <u>Extraction Code for Posting of New Standards:</u> Siskin possesses and failed and refused to provide to JCR the extraction code to move JCR's new Fifth Edition Accreditation Standards content from Microsoft Word to MS SQL server so that those new standards can be posted to JCR's IDBA System for surveyors' use in conducting accreditation surveys after their April 1, 2014 launch.

h. <u>Copies of the Accreditation Standards:</u> So that it could perform the services for which JCR had engaged it to provide, JCR provided Siskin with copies of the Accreditation Standards. JCR holds the copyright to those standards, and they were provided to Siskin only for the purpose of performing services for JCR. Siskin has failed and refused to return this JCR property.

i. <u>Other Items:</u> On information and belief, Siskin possesses other code, scripts, agents, materials and documentation (electronic or hardcopy) relating to JCR's systems, and/or other JCR confidential, proprietary or other materials, including items that may have been loaded into Siskin's and their personnel's (Padraic Heneghan's and/or Vera Dattulo's) computers.

j. <u>Security Card:</u> JCR issued a Security Access Card to Siskin employee Padraic Heneghan for his use during Siskin's engagement with JCR. Siskin has failed and refused to return that card.

14

21.     Siskin failed and refused to return and provide the items listed above (the "Withheld Items") when it announced that it would no longer perform work for JCR, and Siskin has failed and refused to return the Withheld Items to JCR thereafter, despite repeated demands. Specifically, when Vera Dattulo, President of Siskin, informed Kenneth Ryckman of JCR on February 6 that Siskin was ceasing all work for JCR, Mr. Ryckman explicitly asked Siskin to return all JCR property and Confidential Data to which Siskin had been provided access for the purpose of providing IT-related services. Siskin, through Ms. Dattulo, flatly refused. To the extent that Siskin might claim that returning JCR's property would require the expenditure of any time, Mr. Ryckman assured Ms. Dattulo that JCR would pay for it. Still, Ms. Dattulo refused. The next day, on February 7, 2014, legal counsel for JCR sent Siskin the letter attached as Exhibit B hereto, making another demand for the immediate return of its property, to occur no later than the close of business on Monday, February 10, 2014. Siskin made no response. On February 11, 12 and 13, 2014, JCR attempted to reach Siskin by phone in order to resolve this matter without filing suit, but the resulting engage of voicemails and emails (in which Ms. Dattulo repeatedly promised to be available for a call at the end of the day, but then was not) resulted in no action or assurance–or any substantive response–from Siskin. Finally, at the end of the day on February 13, 2014, Mr. Ryckman was able to reach Ms. Dattulo to discuss return of JCR's property. Ms. Dattulo refused to return anything, acknowledging the harm that this would cause to JCR's operations and its surveyors' ability to perform accreditation services, and suggesting that such harm might be averted if JCR would agree to engage Siskin for "extensive" additional work.

22.     There is no excuse or justification for Siskin's refusal to return the Withheld Items. JCR has the right to immediate return of those items, because they constitute JCR property and/or property as to which JCR retains–at the very least–an implied license to use.

**The Injury to JCR and the Need for Injunctive Relief**

23.     Siskin's unlawful refusal to return JCR's property is causing harm, and significant monetary damages, to JCR.  Significant resources are being expended in the effort to identify what property Siskin has taken or is otherwise withholding from JCR, and to mitigate the impact of Siskin's conduct.  For example, JCR has been attempting to identify and reverse-engineer missing code.  Moreover, the lack of certain automated functions has required JCR to do without those functions (e.g., certain reporting functions and templates) and to incur the trouble, delay, and expense of trying to perform certain of those functions manually, where possible.

24.     However, while a few of the less critical processes stymied by Siskin's retention of these items might be accomplished manually (e.g., certain expense reporting functions) at significantly increased cost to JCR, JCR is not capable of replacing all of the automated functions.   And while JCR has undertaken efforts to recreate some of the necessary code being withheld by Siskin, those efforts are costly and are too slow to reproduce the vast majority of the code that Siskin is withholding in time for the launch of the business functions that they were intended to support.  JCR simply does not have the ability and the resources (the manpower, the infrastructure, or the time) to perform the survey process in a timely manner, or perform its analysis and its other necessary functions, without the Systems that Siskin is holding hostage.

25.     Thus, in addition to the lost revenues, substantial costs, and other significant compensable injuries that JCR will suffer as a result of Siskin's conduct, JCR will, absent the

equitable intervention of this Court, suffer irreparable injury for which it has no adequate remedy at law.

26.     For example, Siskin's unlawful retention of JCR's highly sensitive Confidential Data puts that data at risk of further dissemination. By retaining that data beyond the end of its engagement with JCR removes the data from JCR's control and protection, and puts it at risk for unauthorized use or disclosure—whether purposeful or inadvertent—by Siskin and/or the various individuals and entities who might have or gain access to Siskin's facilities and/or equipment. Once this data is disseminated or disclosed, the damage cannot be undone—its secrecy, and the value that is imparted by that secrecy, is likely to be lost forever. Even in the unlikely event that Siskin continues to employ all necessary steps to safeguard the Confidential Data, its unlawful retention of that data—and the other Withheld Items—will cause irreparable damage to the trust and good will that JCR's clients have placed in it, and in which JCR has invested so much.

27.     Moreover, as Siskin well knows, and as JCR has informed Siskin several times in recent days, JCR is unable to access or use certain of its Systems and Tools without the Withheld Items. For example, JCR's new Fifth Edition Standards become effective on April 1, 2014. JCR has commitments to deploy surveyors to healthcare organizations in numerous countries to inspect and evaluate those organizations' compliance with the new standards. Without the updated version of JCR's IDBA and the other code being withheld by Siskin, JCR's ability to meet its commitments to provide accreditation and accreditation-related services in connection with those standards will be substantially impeded. Siskin's unlawful retention of the source code and agents for JCR's systems is preventing critical business functions from launching, including automated international survey scheduling, and the integration of Fifth Edition Accreditation

Standards and decision rules within the electronic Systems and Tools used by international surveyors who are engaged in surveys for JCR and its clients.

28.     Similarly, Siskin's unlawful retention of the extraction code needed to post the new Fifth Edition standards in JCR's IDBA system (to move the standards content, which is in a Microsoft Word document, to JCR's IDBA database on its MS SQL server) is preventing the publication of that material through JCR's IDBA system.  This new edition of the Accreditation Standards, and the related content that JCR has created for its surveyors, is scheduled for launch on April 1, 2014.  Siskin's conduct is preventing JCR from preparing for, and meeting, that launch date (e.g., doing the loading, testing, and refining) and will result in the standards being unavailable for surveyors using the IDBA in order to conduct accreditation surveys.

29.     The full extent of the resulting harm will be very difficult to quantify.  For example, JCR cannot predict or know what clients will decide – based on Siskin's unlawful retention of the Confidential Data and other Withheld Items – not to retain JCR or use its services.  Once JCR's goodwill and client relationships have been damaged, it would likely be impossible to detect, measure and rectify that loss fully and completely, and JCR therefore will suffer lasting and irreparable harm.

**Siskin's Willful and Malicious Intent to Injure JCR**

30.     Siskin's conduct is willful and malicious, and has been undertaken in bad faith, so as to support and require the imposition of punitive damages.   Specifically, Siskin at all times understood and acknowledged the sensitive nature of the Confidential Data contained within JCR's Systems and Tools and agreed to perform its engagement for JCR consistent with the need to maintain confidentiality. Indeed, Siskin's understanding and agreement in this regard is reflected in the Contract Forms that JCR has been able to locate,

including the form signed by Siskin and attached hereto as Exhibit A. Moreover, JCR has clearly and repeatedly requested that Siskin return JCR's property, including the Confidential Data, and Siskin has refused.

31.     Statements by Ms. Dattulo to Mr. Ryckman make it clear that Siskin's refusal to return the Withheld items, and its infliction of the substantial harm described herein, is willful and malicious. Ms. Dattulo expressed anger at JCR over its insistence on setting forth the parties' agreement in writing, and at JCR's suggestion that the parties should discuss winding down their relationship.   Ms. Dattulo acknowledged the harm to JCR and to its surveyors' ability to deliver accreditation services to clients that would be caused by Siskin's conduct, and suggested that the only way for JCR to avoid such harm, and induce her to release the Withheld Items, would be for JCR to "get creative" and re-engage Siskin to perform "extensive" additional services. Such extortionate conduct cannot be countenanced. JCR has the right to the return of the Withheld Items, or at least to an implied license to use them, and Siskin's refusal to allow JCR access to those items is unlawful under the statues and common law described below.

## COUNT I — BREACH OF CONTRACT AND
## COVENANT OF GOOD FAITH AND FAIR DEALING

32.     JCR incorporates and restates Paragraphs 1 through 31 above as if fully set forth herein.

33.     JCR and Siskin entered into a contract, verbally or in writing, for Siskin to perform IT-related services, as described above.   JCR has paid Siskin the agreed-upon compensation for those services and has performed all of its obligations and requirements under the Parties' agreement.

34.     Siskin has failed and refused to comply with and perform certain obligations under the Parties' agreement, despite being paid in full for those services, including the following as described in more detail above:

    a.    providing JCR with an updated version of its IDBA system reflecting and containing its new Fifth Edition Accreditation Standards,

    b.    returning to JCR the source code for its existing IDBA system, which was developed prior to Siskin's involvement and was provided to Siskin solely for the purpose of facilitating its work on the updated version.

    c.    providing JCR with code (including scripts, agents, tools and automated templates) necessary to operate JCR's Systems and Tools,

    d.    providing JCR with an interface between JCR's new International Scheduling Information System (ISIS) and JCR's other systems,

    e.    providing JCR with the extraction code necessary to allow JCR to post its Fifth Edition Accreditation Standards in its IDBA system, for reference and use by JCR surveyors, and

    f.    maintaining the Confidential Data as confidential and for JCR's exclusive benefit and use.

35.     Siskin's failures described herein constitute breaches of the Parties' agreement.

36.     Inherent in the Parties' agreement is a covenant of good faith and fair dealing. Siskin's conduct described above—including its refusal to return the Withheld Items—constitutes a breach of that covenant.

37.     Siskin's breaches of the Parties' agreement and of the covenant of good faith and fair dealing inherent in that agreement have resulted in great harm and injury to JCR, and which will continue to result in irreparable harm for which there is no adequate remedy at law, absent the equitable intervention of this Court.

## COUNT II – BREACH OF IMPLIED LICENSE

38.     JCR incorporates and restates Paragraphs 1 through 37 above as if fully set forth herein.

39.     Even in the unlikely event that the Court might find that there is no agreement between the parties requiring (and/or that the Parties' agreement and inherent covenant of good faith and fair dealing does not require) Siskin to provide JCR with the Withheld Items, the law recognizes under the facts detailed herein an "implied license" giving JCR the right to possess and use those items. For example:

a.     The Parties did not have an agreement for a long-term commitment;

b.     Siskin never communicated its intent to deny JCR the right to use whatever pieces of code Siskin might develop in the course of its engagement by JCR, until it was facing the end of the Parties' relationship;

c.     The single legal document located thus far that was provided by Siskin and in which Siskin describes its purported rights, vis a vis JCR, does not make any assertion of rights in such code;

d.     The pieces of code at issue were created by Siskin specifically for JCR, for the benefit and use of JCR in connection with JCR's use of its existing Systems and Tools;

e.     The pieces of code at issue do not constitute a stand-alone product, have no utility by themselves, and would have no use to others. Rather, they are updates (in the case of the updated version of the IDBA) and/or "add-ons" (in the case of the SIP tool and the other pieces of code) to existing JCR programs. Thus, they are specific to—and were intended to and do function in conjunction with—JCR's IDBA system, its Accreditation Standards, and its hospital accreditation activities; and

f.     JCR has paid Siskin over $1.2 million to do the work, and develop the pieces of code, at issue, which payment constitutes payment in full, leaving no amounts due to Siskin.

40.     Siskin's conduct constitutes a breach of that implied license and of JCR's right to possess and use the Withheld Items. Because JCR paid substantial consideration for the code at issue, the implied license is irrevocable.

21

41.     Siskin's failures described herein constitute breaches of JCR's implied and irrevocable license to possess and use the code developed by Siskin for JCR described above, which breaches have resulted in great harm and injury to JCR, and which will continue to result in irreparable harm for which there is no adequate remedy at law, absent the equitable intervention of this Court.

## COUNT III — CONVERSION

42.     JCR incorporates and restates Paragraphs 1 through 41 above as if fully set forth herein.

43.     JCR has the right to immediate possession of the Withheld Items. Each and every Withheld item is either JCR's exclusive property or is computer code developed by Siskin specifically for JCR and specifically for use in connection with existing JCR software programs, such that JCR has–at the very least–a license to possess and use that code, by operation of law, as described above.

44.     Siskin has no right to withhold the Withheld Items from JCR, and JCR has the immediate right to possess with Withheld Items.

45.     JCR has made, and Siskin has refused, repeated demands to return the Withheld Items to JCR. Siskin has repeatedly denied JCR possession of the Withheld Items, to the injury and detriment of JCR.

46.     This conduct constitutes an unlawful conversion remediable under the common law.

## COUNT VI – BREACH OF FIDUCIARY DUTY

47.     JCR incorporates and restates Paragraphs 1 through 46 above as if fully set forth herein.

22

48.     Siskin was engaged as an independent contractor to provide services relating to JCR's computer system and information technology.  This is a highly technical and specialized field, and JCR retained Siskin in order to rely, and JCR did rely, on Siskin's superior knowledge and expertise in that area.   JCR reposed trust and confidence in Siskin to maintain, support, and update its Systems and Tools in such a manner that JCR could use and rely on those tools in its provision of its accreditation services to its healthcare clients.

49.     The circumstances of JCR's engagement of Siskin, and the resulting relationship of trust and confidence, therefore vested Siskin with a fiduciary duty.

50.     Pursuant to this relationship of trust and confidence, JCR provided Siskin with the source code for those existing Systems and Tools relevant to Siskin's work–including the existing version of its IDBA database and the data residing it in–for the purpose of developing and testing the updates and modifications that Siskin had been engaged to perform on the IDBA to reflect and contain JCR's new Fifth Edition Accreditation Standards.  JCR provided Siskin with access to the existing IDBA system by loading a copy of that system into a separate and dedicated space on a JCR "development server" and providing Siskin with access credentials that would allow it to enter that space.

51.     Siskin breached that fiduciary duty by engaging in the conduct described herein, including but not limited to:

a.      failing to store on JCR's servers, or removing from JCR's servers, the updated IDBA System, the current version of the IDBA System, the SIP tool, the ISIS interface, and/or the other pieces of code described above, for the purpose of depriving JCR of those items, harming or threatening to harm JCR's business;

23

b.  failing and refusing to return the Withheld Items when JCR requested their return, as the parties began to discuss the end of their relationship.

52.  Siskin's breaches of its fiduciary duty have resulted in great harm and injury to JCR, and which will continue to result in irreparable harm for which there is no adequate remedy at law, absent the equitable intervention of this Court.

53.  Siskin's failures described herein were willful and malicious and both support and require the imposition of punitive damages in order to deter Siskin, and others, from similar conduct.

## COUNT VII — MISAPPROPRIATION OF TRADE SECRETS

54.  JCR incorporates and restates Paragraphs 1 through 53 above as if fully set forth herein.

55.  The Confidential Data, as described above, constitutes "Trade Secrets" under Illinois law, as embodied in the Illinois Uniform Trade Secrets Act ("IUTSA"), 765 ILCS 1065/1 *et seq.*, because it is technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process or financial data, or list of actual or potential clients or suppliers, that is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

56.  JCR has taken reasonable measures to protect the secrecy of the Confidential Data, including but not limited to the following:

(a)  JCR's facilities are secured with locks and an electronic keypad and alarm system;

(b)  the reception area is staffed by a receptionist who monitors all visitors;

24

(c)  JCR's facilities are locked before and after business hours;

(d)  no visitors are allowed beyond the reception area unless checked-in by the receptionist and authorized by a JCR employee;

(e)  JCR's electronically stored Confidential Data is passcode protected, and JCR limits access, by data base, based on usage and knowledge needs;

(f)  Not all JCR personnel have access to all JCR systems and information. Rather, JCR's passcode protection system is multi-tiered, with specific databases and systems each requiring an additional password for access, further restricting access to that information to only those individuals with a specific need to know it;

(g)  JCR's "production servers" (those containing the "live" and operational versions of its systems) are housed within a secure "off site," data center kept under 24-hour guard;

(h)  JCR's "development servers" and other non-production servers are maintained in a special data center at JCR that is secured with locks and key-restricted access granted only to IT systems administrators and others with specific need and authority to access the center; and

(i)  JCR has policies requiring employees to maintain, and employees sign restrictive covenants to maintain, the security and confidentiality of JCR's Confidential Data.

57.  Siskin was provided with access to the Confidential Data pursuant to clear instructions, and agreement, that it must be maintained as confidential. Siskin knew or had reason to know at the time it obtained (and retained, without authorization) the Confidential Data that it was acquiring access to that data under circumstances giving rise to a duty to maintain its secrecy and to limit its use, and Siskin's retention of that data after its engagement with JCR ended was without authorization from JCR.

58.  Siskin's conduct, as alleged above constitutes actual and threatened misappropriation, use, and disclosure of the Confidential Data in violation of the IUTSA.

59.  Siskin's violations of the IUTSA described above were willful and malicious, and were done in bad faith, and those violations have been and will be the proximate cause of great injury, damage, and detriment to JCR.

25

**WHEREFORE**, plaintiff demands the following relief:

1.      Preliminary and permanent injunctive relief to address and prevent the activities and harm described herein, including but not limited to:

        (a)      requiring Defendants to return to JCR all Withheld Items;

        (b)      requiring Defendants to return to JCR all copies of and all documents containing or reflecting (whether in paper or electronic form) its Confidential Data;

        (b)      enjoining Defendants from using or disclosing any JCR Confidential Data;

        (c)      requiring Defendants immediately to return to JCR all documents, records, files, and other information (whether in paper or electronic form) obtained from JCR as part of and in the course of performing services for JCR, including all materials containing or reflecting or referring to any of JCR's Confidential Data, and including all copies and to the extent that JCR's Confidential Data is stored in or on any email account, computer equipment, or electronic storage system or media in any Defendant's possession or control;

        (d)      requiring Defendants to immediately and permanently remove all those materials, engaging a third-party professional to be chosen by agreement of the parties to effectuate the removal using means reasonably calculated to preserve and hold copies of such data and to ensure that such copies are made to forensic standards for use as evidence in this proceeding, or, absent such agreement, by order of Court;

        (e)      requiring Defendant to submit its computer systems and equipment for third-party inspection and searching for JCR's Confidential Data, removal of that information, and certification that such removal has been effected by the third party, at Siskin's cost;

26

2. Other injunctive and equitable relief sufficient to give JCR the benefit of the bargain contained in the Agreements, to compensate JCR for the unfair advantage obtained by Defendants through their unlawful conduct, and to protect JCR's legitimate protectable interests;

3. An accounting and a constructive trust as to all funds and other benefits received by Defendants as a result of their wrongdoing, including but not limited to all income received by Siskin;

4. Specific performance of Siskin's obligations under the Parties' agreement, including delivery to JCR of all Withheld Items;

5. Damages for all of JCR's compensable injuries and for Defendants' unjust enrichment, in an amount to be proven at trial, including but not limited to lost revenues, the increased cost and expense of conducting its business without the Withheld Items and/or of attempting to recreate the Withheld Items, disgorgement of all benefits reaped by Siskin, plus interest and costs;

6. Attorneys' fees and costs;

7. Exemplary and punitive damages in an amount to be proven at trial; and

8.    Such other and further other relief that this Court deems just and proper.

Dated:  February 18, 2014

Plaintiff Joint Commission Resources, Inc.

By: _____
    Linda K. Stevens

SCHIFF HARDIN LLP
233 S. Wacker Drive
Suite 6600
Chicago, Illinois  60606
(312) 258-5500
DuPage County No. 76000

*Attorneys for Plaintiff Joint Commission Resources*

## 1-109 CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the factual statements set forth in this instrument, Joint Commission Resource Inc.'s Verified Complaint for Injunctive and Other Relief, are true and correct, based on his personal knowledge and his review of company records, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he believes the same to be true.

Kenneth Ryckman
Joint Commission Resources, Inc.

33016-0009/CH2\14212158

29



233 SOUTH WACKER DRIVE
SUITE 6600
CHICAGO, ILLINOIS 60606

*t* 312.258.5500
*f* 312.258.5600
www.schiffhardin.com

Linda K. Stevens
312.258.5667
lstevens@schiffhardin.com

February 7, 2014

**VIA OVERNIGHT DELIVERY AND EMAIL**

Siskin Technologies, LLC
Attn: Mr. Heneghan and Ms. Dattulo
3296 Oak Knoll Road
Carpentersville, IL 60110

> Re: **Siskin Technologies refusal to return Joint Commission Resources property**

Dear Mr. Heneghan and Ms. Dattulo:

It has been brought to my attention that through Siskin Technologies' performance of services for Joint Commission Resources, including, to the extent applicable to its parent, The Joint Commission (collectively "JCR"), Siskin Technologies has possession of and refused to return certain JCR property including, but not limited to:

- Highly confidential data regarding hospital accreditation survey findings and accreditation surveyor evaluation results
- Security Access Card
- Source code and agents related to all work performed, including but not limited to the following systems: International Database for Accreditation (IDBA), Strategic Improvement Plan (SIP), Accreditation Engagement System, Surveyor Expense Reporting, International Scheduling Information System (ISIS) interface to Lotus Notes, and for various Report applications/templates (preventing critical business functions from launching, including automated international survey scheduling, availability of 5th Edition standards and decision rules to international surveyors on survey)
- Copies of Joint Commission International proprietary standards
- Extraction code to move standards content from Microsoft Word database to MS SQL server to allow standards content to be published to through IDBA and be available for surveyors to conduct accreditation surveys using new 5th Edition

Exhibit B



Siskin Technologies, LLC
February 7, 2014
Page 2

       accreditation standards (preventing loading, testing, fixing and production launch by April 1st)

- Production support scripts and agents (MS SQL and Lotus Notes) including any related Job Aids and Documentation (preventing necessary interface between systems to automate applicable business process (such as expense processing) and requiring manually run operations
- Any other materials and documentation (electronic or hardcopy) relating to JCR's systems
- Any JCR confidential, proprietary or other materials on Padriac Heneghan's or Vera Dattulo's computers

(collectively "JCR Property"). It is my understanding that during a conversation with Ken Ryckman of JCR on February 6, 2014, Vera stated that Siskin Technologies would not perform any further services for JCR and that it would not return JCR's property. By this letter JCR makes a final and immediate demand for return of its property. If JCR has not heard from you by close of business Monday, February 10, 2014 it will commence appropriate legal measures to obtain its property. <u>If you have legal counsel, you should promptly refer this letter to counsel and have them contact me.</u>

      Siskin Technologies' refusal to return JCR Property constitutes a misappropriation of trade secrets, a conversion, and a breach of contract. Moreover, your authorization to access JCR Property ended when your engagement ended and JCR confirms by this letter that Siskin Technologies has no such authorization to access JCR Property on your computers. Any further access will be considered a violation of state and federal statutes, including the federal Computer Fraud and Abuse Act, 18 U.S.C. §1030 *et seq.* As Siskin Technologies well knows, this information, and in particular certain source code, is critical to JCR's international accreditation operations. Without this code JCR cannot update and maintain key international accreditation systems and cannot launch planned operational enhancements as scheduled. Failure to launch these systems will have a cascading impact on other planned operational enhancements. In addition, failure to provide this information impacts JCR's day to day ability to provide certain key reports and update or revise such report templates.

      Due to the significant impact, JCR must immediately take alternative actions if it does not receive the JCR Property to ensure continuity and launching of these systems. To the extent JCR must use other resources to recreate the source code or to the extent



Siskin Technologies, LLC
February 7, 2014
Page 3

Siskin's refusal to return the JCR Property interferes with or otherwise damages JCR's business, JCR will pursue such damages, which will increase on a daily basis.

Let me make clear that Siskin Technologies is on notice of JCR's claims and they have become obligated to preserve all emails, documents, and other evidence regarding it's possession, access, transmittal, use and/or copying of JCR Property, which property includes all code, data, and files used in connection with services provided to JCR. Immediate action to preserve this evidence is required. Electronically stored information is fragile and is subject to loss absent affirmative steps to preserve it. JCR demands that Siskin Technologies take the necessary steps to preserve all pertinent evidence, and to place it in the hands of its counsel if it has counsel retained. An "Encase" image of Padriac Heneghan's and Vera Dattulo's computer(s), including any external storage devices, would be the most efficient and effective way of which I am aware that such evidence can be preserved.

Failure to take the necessary preservation measures, and/or any action by Siskin Technologies to delete, scrub, erase, or otherwise destroy such evidence and/or any attempt to delete, scrub, erase or otherwise destroy any JCR Property data, files or information will constitute spoliation of relevant evidence and will subject Siskin to serious judicial sanctions. Moreover, the information is confidential and proprietary to JCR and may not be shared with any third party, or used in any other manner except for the benefit of JCR.

JCR does not really want to fight about this, but you can understand the critical impact to JCR resulting from your withholding the source code its key systems. We hope that you are interested in resolving this matter the right way—working through a proper transition of knowledge and technology. Please contact me, or if you have counsel, please have them contact me at 312-258-5667 to discuss this matter. We need your response by close of business Monday, February 10, 2014. If we have not heard from you by that time, we will immediately pursue legal action.

Sincerely,

*Linda K Stevens*
js

Linda K. Stevens

LKS:js

**Software Services Agreement**
**Siskin Technologies, Inc.**

This agreement is made as of <u>March 1, 2013</u>, by and between <u>Joint Commission Resources</u> ("Client"), and SISKIN TECHNOLOGIES. Inc ("Consultant"), an Illinois company.

Client desires to retain the services of Consultant for Software Application Development and related services. Consultant is willing to perform the services called for upon the terms and conditions set forth in this Agreement.

NOW THEREFORE, for and in consideration of the premises and the mutual covenants hereinafter entered into, the parties agree as follows:

1. <u>Terms of Agreement.</u> The engagement period shall be <u>March 1, 2013 – February 28, 2014.</u>
2. <u>Duties.</u> Consultant shall provide software planning, maintenance, support, design and development services to Client as required by Client.
3. <u>Compensation and Terms.</u> Client shall pay Consultant for these services at an hourly rate of <u>$90.00</u>. Client shall pay Consultant the hourly rate for travel time when such travel is authorized/needed by Client. Travel time includes all time spent between departure from origination and arrival at destination, inbound and outbound, minus any time therein during which billable services are performed. Consultant shall present an invoice to Client weekly for billable services performed. Payment shall be due in full within 30 days of the date of the invoice.
4. <u>Location.</u> Consultant shall complete the work at Consultant's office location. Client shall provide access to client's network and servers via Virtual Private Network (VPN) or other means as necessary for Consultant to perform these services.
5. <u>Expenses.</u> Client shall pay all expenses reasonably incurred by Consultant in the course of performing services under this Agreement, *as mutually agreed upon in advance by the parties hereto.*
6. <u>Confidentiality.</u> Consultant shall treat as confidential and shall not disclose or use for the benefit of any person other than Client any and all information made available or disclosed to Consultant as a result of or related to this Agreement; provided, however, Consultant shall have no obligation hereunder as to any portion of such information which is disclosed by Client to others without any restriction on use and disclosure.
7. <u>Relationship.</u> Consultant is retained by Client solely for the purposes and to the extent set forth in this Agreement, and Consultant's relationship to Client shall during the terms of this Agreement be that of an independent contractor.
8. <u>Termination.</u> Either party, at its sole discretion, may terminate services under this Agreement by giving written notice, in which event Consultant shall be reimbursed only for authorized work performed and authorized expenses reasonably incurred prior to the termination date given in such notice.
9. <u>Waiver, Modification, or Cancellation.</u> Any waiver, alteration, or modification of any of the provisions of this Agreement or cancellation or replacement of this Agreement shall not be valid unless in writing and signed by the parties.
10. <u>Assignment.</u> Any attempt to assign or transfer any rights, duties, or obligations herein shall render such attempted assignment or transfer null and void.
11. <u>Liability.</u> In no event shall Consultant be liable for any damages arising from the use of the software developed or the services provided under the terms of this Agreement.
12. <u>Governing Law.</u> This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois.

Siskin Technologies, Inc

_____ Signature

Vera Dattulo, President

February 25 Year: 2013

<u>Joint Commission Resources</u>   Client

<u>IT</u>_____ Department

_____ Signature

<u>Ken Ryckman</u> Title: <u>Program Manager</u>

_____ Year: _____

Exhibit A