JOINT COMMISSION RESOURCES, INC.,

      Plaintiff,

    v.

SISKIN TECHNOLOGIES, INC.,

      Defendant.

No. 14 CV 1843

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Siskin Technologies, Inc. wrote software for and gave technical support to Joint Commission Resources, Inc., a non-profit corporation engaged in accrediting healthcare organizations. For ten years, the parties worked together without a written agreement, but their relationship soured. JCR sued Siskin in state court, bringing several contract and misappropriation-related claims, and obtained a temporary restraining order to compel Siskin to turn over to JCR software code it needed to run its business. Siskin delivered the code, and then removed the case to federal court, arguing that the code was subject to copyright protection. After removal, Siskin counterclaimed for copyright infringement and trade secret misappropriation. JCR now seeks summary judgment on both of Siskin's counterclaims.

For the following reasons, JCR's motion for summary judgment is denied.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Justifiable inferences are drawn in the nonmovant's favor, *id.* at 255, and the party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    Background

JCR, a not-for-profit corporation providing certification and accreditation services to healthcare organizations, conducted annual surveys to evaluate hospitals and the like. [92] ¶¶ 1–2.[1] It used automated systems and tools to operate effectively. [92] ¶ 4. Starting in 2004, Siskin provided software development, support, and maintenance services to JCR as an independent contractor. [92] ¶¶ 5–6; [94] ¶¶ 22–24. Siskin "created software tools, and performed constant data manipulation and report generation activities" for JCR. [94] ¶ 22. Siskin also compiled expense reports for JCR personnel and assisted in troubleshooting user issues. [94] ¶ 23. Every week, Siskin used an Expense Report Generation System to populate an Expense Report Workbook for around 200 JCR employees and contractors. [94] ¶ 27. Siskin created a Survey Implementation Process (SIP) and a

---

[1] Bracketed numbers refer to entries on the district court docket. Siskin's response to JCR's LR 56.1 statement is [92], and JCR's response to Siskin's LR 56.1 statement of additional facts is [94].

Quality Survey Workbench (also referred to as IDBA). [94] ¶ 24. Siskin wrote the source code for these tools and for the entire Expense Reporting System. *Id.*[2]

During the parties' working relationship, Siskin never provided JCR with the source code for the Quality Survey Workbench, Survey Implementation Process, or the Expense Report Generation System (part of the Expense Reporting System), and JCR never asked for the source code. [94] ¶¶ 25, 28. Siskin never provided JCR with, and JCR never asked for, the object code or executable program for the Expense Report Generation System either—without it, the entire Expense Reporting System could not properly function. [94] ¶¶ 26–27, 29. Siskin did provide the source code and executable program for the Expense Report Workbook VBA and Expense Report Workflow System. [94] ¶ 27. JCR never requested a license to use the source code written by Siskin for the Quality Survey Workbench, Survey Implementation Process, or Expense Report Generator. [94] ¶ 35. Siskin owns copyrighted works consisting of source code registered under U.S. copyright numbers: TXu 1-905-526 (Expense Report Workbook VBA Code); TXu 1-905-564 (Expense Report Workflow System); TXu 1-905-561 (Expense Report Generation System); TXu 1-905-459 (Survey Implementation Process or SIP); TXu 1-905-289

---

[2] While JCR does not dispute the fact that Siskin wrote the source code for these tools, [94] ¶ 24, there is some evidence that a third party contributed to the coding of the Quality Survey Workbench (or coded the original version) and, subsequent to the initiation of this litigation, gave his rights to JCR in exchange for payment. [94] ¶ 42.B; [92-9]. It is undisputed, however, that Siskin wrote the code for the Expense Report system and Survey Implementation Process. [94] ¶ 24.

(Quality Survey Workbench or IDBA). [94] ¶ 20.[3] Each of these copyrights has an effective registration date of March 2014. [92-20].

The parties worked together for ten years but never had a written contract. [92] ¶¶ 6, 8; [94] ¶ 30. JCR fully paid Siskin for all services performed, amounting to over $1.2 million over the course of the parties' dealings. [92] ¶ 7. The sums paid by JCR to Siskin were for services, not source code. [94] ¶ 33.[4] About nine years into their relationship, Siskin sent JCR a proposed written agreement, but JCR did not sign it; at some point, JCR proposed a revised agreement, but Siskin did not sign that either. [92] ¶¶ 9–10; [94] ¶ 42.A; [92-5]; [92-8]. The relationship soured after JCR requested that Siskin sign JCR's standard form agreement in order to perform any further services for JCR. [36] ¶ 23. JCR terminated Siskin's access to its computer system, and then sued Siskin in state court, alleging that Siskin retained highly confidential hospital accreditation data as well as software source code needed to operate several of JCR's crucial business systems. [94] ¶¶ 31, 40; [1-1].

The state court granted JCR a temporary restraining order and preliminary injunction, and ordered Siskin to return to JCR all confidential data and "Necessary Software Code," including software code developed by Siskin that was necessary to

---

[3] JCR acknowledges that Siskin owns these registered copyrights, but denies that Siskin "owns" the related source code. To controvert this statement of fact, JCR cites to Siskin's proposed (unsigned) agreement, which is silent on the issue of ownership of work performed for JCR. That evidence, however, does not controvert whether Siskin's copyrights covered source code.

[4] JCR denies this fact by citing to allegations in its original complaint. [92-6] ¶¶ 15–18. But allegations are insufficient to show an issue of fact at summary judgment. *See Celotex*, 477 U.S. at 324.

operate several JCR internal databases, systems, and tools. [94] ¶¶ 40–41; [1-2]. This code specifically included: Quality Survey Workbench source code; Survey Implementation Process code and agents; code relating to JCR's accreditation engagement system and the surveyor expense reporting systems; ISIS interface; and extraction code for posting of new standards. [1-2] at 2. At the TRO hearing, Siskin did not represent that it had any trade secrets in the source code. [92] ¶ 15. Siskin delivered the source code to JCR the day after the TRO was entered. [92] ¶ 16; [94] ¶ 34. Although it moved to dissolve the TRO, Siskin did not move for a protective order restricting JCR's use or dissemination of the code. [92] ¶ 17;[5] [94] ¶ 43.

About three weeks later, Siskin removed the case to federal court by invoking federal question jurisdiction,[6] arguing that the computer source code written by Siskin—and at issue in JCR's claims against Siskin—was the subject of five copyright applications and therefore JCR's claims involved issues of copyright law. [94] ¶ 44; [1]. After removal, Siskin counterclaimed for copyright infringement. [7]. JCR did not seek to have the TRO extended after it expired. [94] ¶ 44. Several months later, JCR amended its complaint, [35], and Siskin again counterclaimed for copyright infringement but also brought a counterclaim for trade secret misappropriation of the source code. [36]. JCR now seeks summary judgment on both of Siskin's counterclaims.

---

[5] Siskin does not dispute this part of the statement of fact.

[6] The parties are not diverse, as they both are Illinois corporations with their principal places of business in Illinois. [92] ¶ 1; [94] ¶ 19.

III. **Analysis**

JCR asserts that it had an implied license to the disputed materials, which would preclude Siskin's claims for copyright infringement or trade secret misappropriation. JCR also argues that the trade secret claim is preempted by the Copyright Act and that Siskin cannot establish the element of misappropriation.

A. **Implied License**

The existence of an implied license is an affirmative defense to a claim of copyright infringement. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). And if JCR had an implied license, it did not misappropriate any trade secret based on the copyrighted work. *See, e.g.,* 765 ILCS 1065/2(b) ("'Misappropriation' means: (1) acquisition of a trade secret . . . by improper means; or (2) disclosure or use of a trade secret of a person without express or implied consent.").

"An implied nonexclusive license has been granted when (1) the licensee requests the creation of a work; (2) the licensor creates the work and delivers it to the licensee who asked for it; and (3) the licensor intends that the licensee copy and distribute the work." *Kennedy v. Nat'l Juvenile Detention Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999) (citing *Shaver*, 74 F.3d at 776).[7] JCR argues that there is no factual dispute as to whether an implied license was granted because over the parties' ten-

---

[7] JCR argues that a broader "totality of the parties' conduct" test applies. *See Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 501 (5th Cir. 2012). But the Seventh Circuit reiterated its established three-part test in *Muhammad-Ali v. Final Call, Inc.*, No. 15-2963, 2016 WL 4248567, at *5 (7th Cir. Aug. 10, 2016) (citing *Shaver*, 74 F.3d at 775–76), and I will apply it here. In any event, JCR does not identify what different "totality of conduct" would establish, as a matter of law, that JCR had permission to use the copyrighted work—the source code, as opposed to the executable software—if there is evidence that Siskin did not deliver the code or intend that JCR copy and distribute the source code.

year relationship, Siskin delivered software to JCR and only at the end of their relationship did Siskin refuse to deliver "what JCR paid for" and asserted exclusive ownership rights in the source code. Siskin asserts that there are factual disputes as to both delivery and intent, contending that while it gave JCR the use of executable programs, it did not deliver the source code (until the TRO) and never intended to grant an implied license. (Siskin does not appear to dispute that JCR requested creation of the work.)

There are five copyrighted works at issue in this case. For three of the works, Siskin has raised a factual dispute as to whether it ever delivered the copyrighted works. For all of the works, Siskin has raised factual disputes regarding its intent to use, copy, or distribute the works. Factual disputes, then, preclude finding that JCR had an implied license to these copyrighted works.

1. *Delivery*

To find an implied license, the licensor must have "delivered" the work to the licensee. Siskin does not dispute that it provided JCR with the source code and executable code for the Expense Report Workbook VBA and Expense Report Workflow System. [94] ¶ 27. Delivery of these two works, then, is not disputed. *See, e.g., Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 755–56 (9th Cir. 2008) (independent contractor delivered computer programs to a company when he installed the programs on the company's computers and stored the source code on-site at the company). But it is undisputed that Siskin never provided JCR with the source code for the other three copyrighted works: Quality Survey Workbench

(IDBA), Survey Implementation Process, and the Expense Report Generation System. [94] ¶¶ 25, 28.

Without delivery, there would appear to be no implied license for these three works. JCR argues, however, that executable code and source code are distinctions without a difference, and that delivery of one constitutes delivery of both for the purpose of an implied license. But the authority suggests otherwise—in other software implied licensing cases, delivery of the source code is considered to be the linchpin. *See Asset Mktg.*, 542 F.3d at 755–56 (computer program was "delivered" when source code was stored on-site at defendant company). At the very least, Siskin has raised a factual dispute as to whether delivery of only the executable program or code was sufficient, particularly when Siskin contends that its copyright and trade secret claims are based on the source code, not executable code. Although computer programs are copyrightable and protectable "[r]egardless of whether the computer program is in object code or source code form," *id.* at 755 n.5, executable code and source code are different types of code. Programmers write source code in a programming language that humans can understand; the source code is then compiled into object or executable code, which translates the source code into binary language to be executed by a computer. *See, e.g., id.*; *Apple Comput., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1243 (3d Cir. 1983). Siskin, therefore, has raised a factual dispute as to delivery of the source code for Quality Survey Workbench (IDBA), Survey Implementation Process, and the Expense Report

Generation System, which precludes a finding that JCR had an implied license for these three works.

## 2. *Intent*

Siskin's intent to grant an implied license is also a disputed factual issue precluding summary judgment on the issue of implied license. Although Siskin argues that it never intended or agreed to grant JCR license to possess, retain, use, or modify the source code written by Siskin for the Expense Reporting System (*see* [94] ¶¶ 36, 38), Siskin's subjective intent is not determinative. Instead, "[t]he relevant intent is the licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' conduct." *Asset Mktg.*, 542 F.3d at 756. Relevant factors include:

> 1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship;
>
> 2) whether the creator utilized written contracts providing that copyrighted materials could only be used with the creator's future involvement or express permission; and
>
> 3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*Id.* (quoting *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 41 (1st Cir. 2003)). This list is not necessarily exhaustive. *John G. Danielson*, 322 F.3d at 41.

For the first factor, the nature of the parties' relationship, there is evidence in the record suggesting that the parties contemplated an ongoing relationship, which would weigh against finding an implied license. It is undisputed Siskin provided

ongoing technical services to JCR over the course of a ten-year relationship—Siskin was not involved in a one-off, discrete project. The existence of an ongoing relationship between a business and an independent contractor is usually taken to indicate a lack of intent to grant an implied license, or at least to be a neutral factor, because it indicates an intent to remain involved in the job or project. *See, e.g., Asset Mktg.*, 542 F.3d at 756; *John G. Danielson*, 322 F.3d at 41; *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 516 (4th Cir. 2002); *compare Shaver*, 74 F.3d at 776–77 (architect's preparation of preliminary schematic drawings, with no objective indication that the architect would have a further role in the project, suggested an intent to convey an implied license). While it is true that, as in *Numbers Licensing, LLC v. bVisual USA, Inc.*, 643 F.Supp.2d 1245, 1253 (E.D. Wash. 2009), the software developer had several years to make known its intent to retain its rights, the failure to express such intent does not establish as a matter of law that the developer gave its customer a license. It is a fact in JCR's favor, but not a dispositive one, because there are other facts, viewed in a light favorable to Siskin, that suggest that Siskin did not intend to release control over its work.

Siskin provided many technical services to JCR over the course of ten years, the "data manipulation and report generation activities," in addition to software development. [94] ¶¶ 22–24. These kinds of interactions suggest that Siskin intended to remain involved in the processes associated with the software that it had created, instead of merely dropping services and software into JCR's hands and

walking away with the expectation that JCR would use the programs on its own or with another technical services provider. *Compare John G. Danielson*, 322 F.3d at 42 ("If an architect worked on a short-term assignment with no outward signs of expecting to continue involvement with the larger project, and handed over the requested plans to a client without a contract or other limitations, it would not matter if he or she harbored private hopes of working on the next phase of the project. But that is not what happened here.") (citation omitted). Moreover, JCR did not cite evidence to controvert Siskin's statement of fact that the sums paid by JCR to Siskin were for Siskin's services, not source code. [94] ¶ 33.[8]

The unexecuted draft agreements indicate some possible limitations to the scope of the parties' ongoing relationship. Although unsigned, these agreements can still be considered as evidence of intent. *See Asset Mktg.*, 542 F.3d at 756 (citing cases). Siskin's draft agreement (sent to JCR in 2013 and which JCR declined to sign) was for an "engagement period" of one year, during which Siskin promised to "provide software planning, maintenance, support, design and development services to [JCR] as required by [JCR]"—in turn, Siskin would be paid for its services at an hourly rate. [92-5]. The agreement also provided that Siskin would complete work at its offices, accessing JCR's network and servers by VPN or by other means to perform the technical services. *Id*. JCR's revised redline version (which Siskin did not sign, [94] ¶ 42.A) also was for a one year period and provided for hourly compensation [92-8]. Although a limited term period could belie the ongoing nature

---

[8] See footnote 4 above.

of the parties' relationship, payment for hourly *services* (and not by project or for creation of specific software tools) could suggest more of an ongoing relationship than a discrete term project, and sheds little light on whether the *code* was offered to JCR with an implied license.

Siskin did not use written contracts with a reservation of rights concerning copyrighted materials. The lack of an agreement with language indicating an intent to retain control is a factor typically suggesting an intent to grant an implied license. *See, e.g., Shaver*, 74 F.3d at 777; *compare Johnson v. Jones*, 149 F.3d 494, 500–01 (6th Cir. 1998). Siskin's draft agreement was silent on ownership or licensing of any intellectual property, and this silence suggests that Siskin did not intend to restrict use of the programs and source codes. JCR's revised draft agreement, however, added an extensive section on intellectual property. [92-8]. Essentially, the additional terms would have granted JCR an express license, if not outright ownership, of the now-disputed works. But Siskin did not sign this revised agreement. From these dueling, unsigned drafts, a fact finder could reasonably draw the inference that Siskin did not want to grant a license. The counter inference could also be drawn, but summary judgment is not the method to resolve the tension.

The final factor to consider for intent is whether the creator's conduct during the creation or delivery of the copyrighted material indicated permission to use the material without the creator's involvement or consent. It is disputed whether three of the five works were actually ever "delivered" to JCR because the source code was

not handed over until the TRO was granted. However, the line "Copyright 2010 Joint Commission International. All Rights Reserved" was included on one splash screen on the Survey Implementation Process system (although nowhere else in the source code for the Survey Implementation Process, Quality Survey Workbench, or Expense Reporting System), [94] ¶ 37, which could indicate that Siskin intended to grant JCR ownership or an implied license for that work. For the other two works (the Expense Report Workbook VBA and the Expense Report Workflow System, which were both part of the Expense Reporting System), Siskin gave JCR both the source code and the executable code but did so in a manner suggesting that Siskin did not intend for JCR to use the Expense Reporting System without Siskin's involvement. Specifically, Siskin never provided JCR with (and JCR never asked for) the executable program for the Expense Report Generation System—without it, the entire Expense Reporting System could not properly function. Siskin's retention of the key to operating the Expense Reporting System raises a factual dispute over whether Siskin intended for JCR to use the Expense Reporting System without Siskin's future involvement or express consent. On this record, JCR has failed to establish that there are no factual disputes regarding delivery and Siskin's objective intent to grant JCR an implied license.

Another factor precluding summary judgment on the implied license issue is that JCR has not proven the scope of the alleged implied license. "Importantly, 'an implied nonexclusive license . . . does not transfer ownership of the copyright to the licensee.' It 'simply permits the use of a copyrighted work in a particular manner.'"

*Muhammad-Ali*, No. 15-2963, 2016 WL 4248567, at *5 (quoting in part *Shaver*, 74 F.3d at 775) (internal citations omitted). JCR's motion for summary judgment is vague as to the extent of any alleged implied license from Siskin and does not address whether JCR's rights under an implied license would have included possession, use, distribution, and/or modification of the source code. In JCR's reply brief, it argues that licensees can only exceed the scope of a license when they create a competing program or business. [93] at 4–5. But in both of JCR's cited cases, the scope of the implied license was based upon particular findings in the record regarding the parties' conduct or contracts. *See MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 779 (3d Cir. 1991); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088–89 (9th Cir. 1989). In contrast, JCR does not affirmatively address the scope of any alleged implied license with Siskin based on the facts in this particular case.

JCR is not entitled to summary judgment on Siskin's counterclaims on the basis of an implied license.

## B.    Trade Secret Claim

JCR also seeks summary judgment on Siskin's trade secret misappropriation claim for two additional reasons. JCR argues that Siskin's trade secret claim is preempted by the Copyright Act and that Siskin cannot show that any alleged trade secrets were obtained through "improper means."

### 1.    *Preemption*

State-law claims are preempted by the Copyright Act, 17 U.S.C. § 301(a), if two elements are met: (1) "the work in which the right is asserted must be fixed in

tangible form and come within the subject matter of copyright as specified in § 102," and the rights in the state-law claims "must be equivalent to the exclusive rights under the Copyright Act." *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 500 (7th Cir. 2011). Siskin does not dispute the first element. To establish a claim for trade secret misappropriation, a plaintiff must show that (1) a trade secret existed, (2) the trade secret was misappropriated, and (3) the owner of the trade secret was damaged by the misappropriation. *Liebert Corp. v. Mazur*, 357 Ill.App.3d 265, 281 (1st Dist. 2005). The Illinois Trade Secrets Act defines "misappropriation" to mean the acquisition of a trade secret "by improper means" or unauthorized disclosure or use. 765 ILCS 1065/2(b); *see Liebert*, 357 Ill.App.3d at 281. "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2(a).

All ten circuits to have considered the issue have found trade secret misappropriation claims not preempted by the Copyright Act. *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, No. 15-10121, 2016 WL 4698270, at *5 (5th Cir. Sept. 7, 2016) (collecting cases). JCR, however, argues that cases finding no preemption did so because the trade secret claims were based on breach of a confidential relationship or duty of confidentiality, which added an extra element differentiating the trade secret claim from copyright infringement. *See, e.g., Seng-Tiong Ho*, 648 F.3d at 503–04; *Stromback v. New Line Cinema*, 384 F.3d 283, 303–04 (6th Cir. 2004); *Higher Gear Grp. v. Rockenback Chevrolet Sales*, 223 F.Supp.2d

953, 958 (N.D. Ill. 2002). Because Siskin's trade secret claim is premised on JCR's alleged misrepresentations to the state court when it obtained the TRO, and not any duty of confidentiality owed by JCR to Siskin, JCR asserts that this extra element is lacking in Siskin's case and therefore the trade secret claim is preempted.

In *GlobeRanger Corp. v. Software AG United States of America, Inc.*, the defendant tried to distinguish the authority holding trade secret claims not preempted, on the ground that a "considerable number" of cases did so because the trade secret misappropriation claims required proof of a confidential relationship, which provided the extra element required to survive preemption. 2016 WL 4698270 at *6. But, as the Fifth Circuit explained, in cases where a defendant did not owe a duty of confidentiality to the plaintiff, other circuits have held that the trade secret claims were not preempted because they still involved "additional wrongful conduct beyond mere reproduction." *Id.* (collecting cases). Trade secret rights are not equivalent to copyright rights, and therefore not preempted by the Copyright Act, "[b]ecause trade secret law protects against not just copying but also any taking that occurs through breach of a confidential relationship *or other improper means*." *Id.* at *5 (emphasis added).

*Seng-Tiong Ho v. Taflove* does not hold otherwise, and does not limit viable trade secret claims to those involving a breach of a confidential relationship. Similar to *GlobeRanger*, *Seng-Tiong Ho* held that an Illinois trade secret misappropriation claim was not preempted because it "regulates conduct beyond the

rights under the Copyright Act." 648 F.3d at 503. Importantly, "[t]he act of publishing the allegedly copied materials would not itself establish a trade secrets misappropriation claim." *Id*.; *see* 1-1 Nimmer on Copyright § 1.01[B][1] ("[I]n essence, a right that is 'equivalent to copyright' is one that is infringed by the mere act of reproduction, performance, distribution, or display."). In reaching this conclusion, *Seng-Tiong Ho* noted that "[a] trade secret misappropriation involves the acquisition of a trade secret through improper means, which requires the breach of a confidential relationship or other duty to maintain secrecy." *Id*. (citing 765 ILCS 1065/2(a), (b)). The Seventh Circuit then concluded that "[a] claim of trade secret misappropriation, then, requires that the information have a status of secrecy and that a confidential relationship be breached," and "[b]oth of these elements go beyond the rights regulated under the Copyright Act." *Id*.

While at first blush this language would seem to support JCR's argument that a breach of a confidential relationship is required to both establish a trade secret misappropriation claim and to prevent preemption, *Seng-Tiong Ho* cannot be read so narrowly—it merely summarized the trade secret claim at issue in that case. Illinois law is clear that misappropriation through improper means does not always require "the breach of a confidential relationship or other duty to maintain secrecy"—that is merely one avenue to establish improper means. Theft would not necessarily be a breach of a confidential relationship, but it would be an improper means under the Trade Secrets Act, and would be beyond the mere copying protected under the federal statute. Similarly, misrepresentation—the

17

misappropriation theory urged by Siskin here—does not require a breach of confidence, yet is improper under the Trade Secrets Act and is something above-and-beyond the required elements of a copyright claim.

*Seng–Tiong Ho* is consistent with *GlobeRanger*'s statement that "[b]ecause trade secret law protects against not just copying but also any taking that occurs through breach of a confidential relationship *or other improper means*, all ten circuits that have considered trade secret misappropriation claims have found them not preempted by the Copyright Act." *GlobeRanger*, 2016 WL 4698270, at *5 (emphasis added) (citing, *inter alia*, *Seng–Tiong Ho*, 648 F.3d at 503–04, and *Stromback*, 384 F.3d at 302–05).

Moreover, breach of a confidential relationship was only one of the elements that went "beyond the rights regulated under the Copyright Act"—the other element was "that the information have a status of secrecy." *Seng-Tiong Ho*, 648 F.3d at 503; *see also* 1-1 Nimmer on Copyright § 1.01[B][1][h] ("Actions for disclosure and exploitation of trade secrets require a status of secrecy not required for copyright and hence, are not pre-empted. Absent a state-based requirement for secrecy, however, the element distinguishing the state right from copyright would evaporate, causing the state right thereby to be pre-empted."). This element of secrecy is also present in Siskin's trade secret claim, and therefore provides an additional reason for why the trade secret misappropriation claim—unlike state-law claims for conversion—regulates different conduct and interests than the Copyright

Act. Siskin's trade secret misappropriation claim is not preempted by the Copyright Act.

### 2. *Improper Means*

JCR also argues that Siskin cannot establish the element of misappropriation. Because JCR obtained the source code from Siskin by way of a TRO in state court, JCR asserts that there can be no showing of improper means to establish the element of misappropriation. But misrepresentations are considered "improper means," 765 ILCS 1065/2(a), and Siskin's trade secret claim is premised on the argument that JCR misrepresented the parties' relationship and ownership of the source code in order to obtain the TRO in state court.[9] Specifically, Siskin argues that JCR misrepresented the existence of a written contract, ownership of the Quality Survey Workbench, creation and possession of source code and updated versions to source code. [91] at 13. Siskin's presentation of its trade secret claim differs significantly from *Glasstech, Inc. v. TGL Tempering Systems, Inc.*, cited by JCR, where an alleged trade secret was not acquired improperly when it was

---

[9] JCR argues that Siskin cannot prevail on a trade secret misappropriation claim because it cannot show that the parties had a confidential relationship. But establishing breach of a confidential relationship is merely one avenue of establishing "improper means" for misappropriation. *See* 765 ILCS 1065/2(a). Misrepresentation is another, and does not require the existence of a confidential relationship. Neither party has addressed whether such misrepresentations must be material, as required for a standalone fraudulent misrepresentation claim. However, the Restatement (First) of Torts § 757 (1939), comment f on clause (a)—cited by JCR in the context of the definition of "improper means" (although JCR's quote is actually from comment g)—suggests an expansive view of "improper means," stating that "[a] complete catalogue of improper means is not possible," but "[i]n general they are means which fall below the generally accepted standards of commercial morality and reasonable conduct." The Restatement also suggests that misrepresentations falling under "improper means" may not need to meet all elements of a traditional fraudulent misrepresentation claim (e.g., a showing of harm). *Id.*

purchased after a bankruptcy sale. 50 F.Supp.2d 722, 729–30 (N.D. Ohio 1999). *Glasstech* did not involve a situation where misrepresentations were allegedly made in order to secure a court order, which is what Siskin argues occurred here.

JCR also argues that no misrepresentations could have been made to secure the TRO because Siskin was represented by counsel, had the opportunity to object, and never filed a motion for reconsideration or return of the code after the TRO expired. But the fact that JCR's statements succeeded does not mean they were not false. Siskin did not succeed in preventing the TRO, and could have chosen other litigation strategies or arguments, but that does not preclude the possibility that JCR may have misrepresented the true state of affairs in order to quickly access source code for systems that were admittedly crucial to JCR's operations. For example, JCR does not dispute that it claimed that Siskin withheld from JCR an updated version of the Quality Survey Workbench, even though JCR was aware that the parties' relationship ended before the updated version had been created by Siskin, essentially putting Siskin in the position of being ordered to turn over source code that had not yet been created. [94] ¶ 42.G. JCR also does not dispute that it claimed that it had ownership of the original Quality Survey Workbench source code, although it was coded by a third party (who did not assign rights to JCR in a written contract until 2015, a year after the complaint). [94] ¶ 42.B.[10] Moreover,

_____

[10] The third party's coding of, or contribution to, the source code for the Quality Survey Workbench has only been addressed by the parties in an ancillary manner, although it may have substantive implications on Siskin's claims as to that source code. JCR, however, did not dispute that Siskin wrote the source code for the Quality Survey Workbench. [94] ¶ 24.

JCR's arguments in support of the TRO (and the language of the TRO itself) reflect the idea that the TRO would have Siskin "return" source code for which JCR had bought and paid for, when that may have not have been the real situation.[11] At trial, Siskin may have difficulty showing that these statements were knowingly false—not merely one party's characterizations of an ill-defined and ongoing business relationship—but whether such statements were misrepresentations, mistakes, or merely JCR's opinion of the status of the parties' contractual relationship cannot be resolved on a motion for summary judgment.

## IV. Conclusion

JCR's motion for summary judgment, [82], is denied. A status hearing is set for 10/13/16 at 9:30 a.m.

ENTER:

Manish S. Shah
United States District Judge

Date: 9/29/2016

---

[11] *See* [92-13] at 3 (Siskin informed JCR "that it would not return to JCR certain property"); *id*. at 5 ("And yet Siskin has failed and refused to return to JCR various items – the 'Withheld Items,'" which included source code.); [92-14].